Good morning, Your Honors. If it may please the Court, my name is Michael Wiggins. I'm here for the Appellant Diana Carey, Trustee for the Bankruptcy Estate of Wade Cook Financial Corporation. From the outset, I'd like to reserve five minutes of my time for rebuttal, although I'm not sure I will need that. This is the first time in my career that the Appellate Court has actually invited discussion. And it was submitted to us, the case Dinaxis, which I think, if I'm understanding where the Court is going, relates to the mutual mistake issue, and that's where I'll begin my presentation. The District Court's order granting Caliber One's motion for summary judgment on the policy limit issue was erroneous for two very important reasons. The first being the District Court ruled that as a matter of law, extrinsic evidence was inadmissible in that case. Now, the record's vague at best as to whether or not that decision impacted the Court's analysis on the mutual mistake issue, being that there's no evidence to suggest one way or the other. We have to assume that it did. The Schweitzer case was cited for the proposition that extrinsic evidence is inadmissible. But the Schweitzer case right immediately thereafter says in the case of mutual mistake, or more appropriately, reformation based on mutual mistake, extrinsic evidence is admissible to show the mistake. So we'll go to the second issue, and that is the mistake itself. The Court's order really linchpins on this notion, and the Court flat out says it, that Crump, WCSC's agent, knew of the mistake. More accurately, to be fair to the Court, it says that Crump knew of the $500,000 sublimit. Well, the issue here is there was no evidence in the record that Crump, in fact, knew that the $500,000 was a mistake. What is undisputed is that WCSC contacted Crump, said renew the original policy, including the $5 million earthquake sublimit, on the same terms and conditions. What's also undisputed is that Crump forwarded that to Caliber 1, same terms and conditions, and that Caliber 1 confirmed that, same terms and conditions. So the Court's reasoning that these four declarations, I believe it was, that they relied on that showed the erroneous sublimit was proof positive or created an obvious implication, is the term the Court used, that Crump knew about the mistake is without factual basis in the record. Well, if there was no Crump, we would have a Scrivener's error leaving off a point taking it from $5 million to $500,000. Yes, Your Honor. And no problem, mutual mistake. As I understand it, the position that's been taken upon which you lost is that even though Crump didn't know it was a mistake, that Crump knew it said $500,000, therefore your client must know that there's been a change and signed on to it. Your argument is that you can't just give half of Crump's knowledge. You can give of the $500,000 that knowledge, but he also has to know that there's a mistake before it counts? Well, I think if the Court were to track the district court's reasoning, it doesn't seem like there would ever be a mutual mistake or that that legal doctrine would be rent, because any time someone contemplated or parties mutually intended a particular term in a contract, and then as soon as they got the contract and it had a different term and they just didn't catch it, and they signed the contract, put pen to paper, that you would bar yourself from a mutual mistake reformation claim. I think reformation based on mutual mistake is much more simpler. What did the parties intend and what was actually produced in the document? So I think the Washington laws on your side there, there can be a negligent mistake and you're not going to be barred from it. Correct. And is it accurate along those lines? Looking at it from the insurance company's standpoint, they concede it was a Scrivener's error in the first instance. Yes, Your Honor. Is that accurate? Am I accurate in understanding that there was no premium differential depending on the level of earthquake coverage? The premium actually increased, albeit relatively slightly. Yes, it was $2,000. Well, actually it went down to $2,000 the first year and then went up a couple thousand the next year. Right. But in any event, is there any dispute as to whether in underwriting the risk, the insurance company put some premium value on the earthquake coverage? Caliber 1 certainly takes the position that the earthquake policy was an add-on to the general commercial policy that WCFC had obtained. So it had already been added on at the $5 million level. So it existed in the first one. Correct. And then when it dropped to $500,000, did they adjust the premium? Downward. It did not go down. It went up. All right. That's my question. And in fact, Caliber 1 has taken the position that those premiums are not reflective of the policy. They may not be indicative of the policy coverage simply because it was an add-on. But if you look at some of the endorsements that we provided that were on the record, it clearly states when WC added properties to its portfolio, there was an increase, again, ever so slightly in a deductible. So to say that the premium was completely independent of the policy coverage amount or the earthquake supplement, there's no basis in the record for that. If there had been a conscious decision to reduce coverage, if the insurer intended, for example, that it no longer wanted to have a $5 million risk, would it have told the insured of that by an endorsement? Caliber 1 says no. The actual policy itself, I think it's page 00010, actually says that if there are any amendments or waivers to the policy, those have to be included in an endorsement. And it was clear, not just the policy, but the course of performance of the parties suggested that any changes to the property policy were always accompanied by an endorsement. And that would have been true on a renewal situation? Exactly. Because an insurance policy really is, it's one contract. It's, you could say it's more akin to an option than anything else, in that the policy stays the same. And then you just, the insurance company approaches you and says, do you want to maintain this policy for the next year? And you say yes or no. And then the parties, if there's adjustments made up or down, that's when those take place. What exactly factually was Crump's role in this middleman position between your client and Caliber 1? What was their, factually what was their role there? What did they actually do? What was Crump, this was an individual person at Crump, right? Gus Kent would be, I think, the person that we're referring to with the original renewal. Mainly a broker representative of WCFC. And we don't dispute that Crump was an agent for WCFC in these processes. There was a subsequent litigation that dealt with that very issue. But he was instructed to get the policy on the same terms and conditions as the first policy. Correct. So was he, did he have authority to do anything else? We would argue that the answer to that question is no. And that relates, Your Honor, a little bit to one of the other issues of error that we assigned, and that was these declarations from Deborah Burdick on the motion to reconsideration. At the time, the court, again, the court ruled as a matter of implication, I guess, or obvious implication, that Caliber 1 or Crump knew about the mistake. They say knew about the sublimit. They don't say knew about the mistake. They knew about the reduced sublimit. Did they know that it was reduced? I mean, that's another question. There's no evidence in the record that they did. Well, just to understand how a broker works, I mean, I have an insurance broker. I guess most of us do. You rely upon your broker to be the expert in the insurance coverage. So presumably when Crump was processing the renewal policy, he was reading it, and presumably it would have, in the ordinary course, should have seen a differential between $5 million and $500,000. Now, it may not have, in fact, done it, but would that not be part of its responsibility to make sure that the renewal policy was consistent with what because that's what it was charged to do. It was supposed to get the same kind of coverage, wasn't it? I appreciate the question, Ron. I think the answer is, under an agency theory, yes. But as those responsibilities flow to WCFC and back and forth, so do the opportunities to assert any sort of defenses. Crump, if the district court concluded that Crump was WCFC's agent, Crump would be entitled to the same mutual mistake in context, I guess is a word, that WCFC would be entitled to. Again, Crump notified. Take WCFC out of it for a second. Crump notified Caliber 1 of its desire to renew under the same terms and conditions. It came back. It's undisputed in the record that both parties were mistaken, that they just didn't catch the error until after the earthquake actually occurred. Now, Crump came in after the first policy. He came in after the first policy. I believe that is correct. Yes, Your Honor. And he was told, we want the same policy. Then a policy was sent over, policy number two, and it had the error in it, the Scrivener's error. Yes, Your Honor. There's nothing in the record to show that Crump ever saw the first policy of 5 million. Is that correct? That is — I don't think there's any — I think it's — to be intellectually honest about it, I don't think there's anything in the record to say one way or the other whether they know. I had thought that the first policy Crump was asked to review had the Scrivener's error in it of 500,000. And I didn't understand how — I think the evidence in the record, Your Honor, is that Crump reviewed the actual original policy, including all the terms and conditions therein, and then when they renewed. Did he have the first policy in his hand? At the time of the renewal? At the time of the renewal. I don't know the answer to that question. I know it's — What's in the record on that? I'm sorry, Your Honor. This was granted motions for summary judgment, so I'm just wondering, some of these factual questions, they might be leading me to think that maybe there was a genuine issue of material factor, because some of these — I'm not finding answers to some of these factual questions in the record. That's our contention, Your Honor. And I think — I think with all due respect to the trial court, I don't mean to disrespect them, but there were cross motions that were going here. Caliber 1 and WCFC had filed cross motions on the two same issues, the policy limits and the deductible. And I don't know if this is the case, this is just conjecture, but there were shifting burdens of proof on either side. It's conceivable that the district court sort of threw everything into the pot and said, well, what makes sense? But what we're — what we are concerned about here, granted we have moved — we have asked — we have appealed the denial of our summary judgment motions, but I'm limiting my discussion here to the granting of theirs for efficiency's sake. The burden was on — the burden was on them to show no genuine issue of material fact, and they were required to produce competent evidence in the record that that was the case. If there were — if there was any disagreement as to whether or not Crump knew, then that matter should have been decided in WCFC's favor. I assume that the Court presented us with a Dinaxis case for a reason. I would like to discuss that a little bit, because I think it is a very important case. The Dinaxis case, in that opinion, the Court first found that the purchaser — and I won't go too much into the facts. I'm assuming the Court probably knows them as well as I, if not better. The purchaser in that case signed a REFSA that contained an inaccurate legal description of the property. It actually painted the properties larger than it really was. So in between the time that REFSA was signed and the closing documents were executed, the purchaser not only received, the purchaser produced a title commitment report, a preliminary title commitment, and a survey that contained the actual accurate, correct legal description of the property. So the Court in that case held, and I should say based upon non-Washington law, based upon, I think, a Missouri court of appeals case and two federal claims court cases, that because it had that information in front of it that actually contained the accurate legal description, that the purchaser had constructive knowledge of the mistake. That's not the case here. The only document that had the correct policy limit was the original policy. After that, everything was a mistaken sublimate. It was all $500,000 after that. What's interesting about the Dinaxis case also is that the Court could have stopped there if it was confident on its reasoning, but it didn't. Right after it reaches that conclusion on constructive knowledge, it goes on to say, well, Washington law, we recognize, does not bar reformation based on mutual knowledge of the mistake, even if the, I'll say the party asserting the mistake or asserting the reformation was negligent in either discovering the truth or reviewing the documents. Those are two seemingly competing legal propositions. And the only way I can get my head around that is that the Court on the constructive knowledge piece really relied on the fact that the purchaser in that case actually saw the correct amount after the mistake was made. There's no evidence in the record here that that was the case. So was there any evidence in the record that Caliber 1 had a different intent for the 2000-2001 policy than it had for the 1999-2000 policy? I think, I don't know what Cal, I don't know what, I don't think there's any record, there's not any evidence in the record on that issue at all. What, the only thing that the evidence points to is the fact that once that mistake was made, it was just perpetuated through the next renewal. But Caliber 1 did admit that it was the one who made the mistake. After the earthquake, after the claim was made and the policy limits were denied, Caliber 1, or I should say just after the earthquake, Caliber 1 did admit that it had made a mistake in the original renewal. And so, again, that brings up the question, do you have to know that, of the mistaken amount, or do you have to know that that amount is mistaken? And I think that's a very important distinction, and I think Dinaxis would say that you have to know it's a mistake. You have to have, for this constructive knowledge to apply, you have to have something in front of you that tells you of what the correct information or correct provision would say. That just didn't happen here. And I guess looking back at the court's order, the court didn't make a constructive knowledge analysis. It flat out said the obvious implication is that Crump knew. There's nothing in the record to support that it did. And that's why, on motion for reconsideration, we submitted these additional declarations because we didn't know that that was, at the time of the summary judgment pleadings, we didn't know that that was an issue at bar. We understood the implication that WCFC was bound by its agent's actions and so forth, but we didn't know that it was going to be assumed that Crump knew. Would you discuss the deductible issue for a moment? Sure. We recognize that the deductible issue could potentially survive, regardless of what this Court decides on the policy limit issue, because the deductible would be perhaps a reimbursement back to WCFC for monies paid on what it did. There's no dispute that the $500,000 was paid on the policy. The language of the deductible says it's 5% of each occurrence, minimum 50,000. I think I'm paraphrasing what that says. Yes, Your Honor. So what is your construction of that language? Our construction is, and if you look at, I believe, the Witherspoon case, you interpret these insurance contract provisions in a way consistent with the way a reasonable purchaser or an average, I think is the word that's used in the case, purchaser of insurance would interpret the provisions. I'm an average purchaser of insurance, and any time I think of deductible, I think it is a factorial of the amount of the loss. Now, the Court there decided, well, it was an ambiguous term, and therefore allowed the extrinsic evidence of these pre-binder correspondence back and forth, the schedule of values that said 5% of total insured value or TIV. For purposes of summary judgment, this wasn't a trial. For purposes of their summary judgment where the burden was on them to show no genuine issues of fact, we would just present to the Court today that there was at least a genuine issue of fact. Even if at the end of the day, the fact, the finder of fact concluded that it was TIV, total insured value, not just a percentage of the loss, so be it. But for purposes of summary judgment, the Court erred when it went there because one of the issues of fact was TIV. Well, in this case, the judge decided 5% is ambiguous and asked for outside evidence. The other side put in evidence. You put in none. There's no conflict. You can go ahead and have summary judgment. Well, I agree and I respectfully disagree, Your Honor. I don't think the Court found that the 5% was ambiguous. I think it found that the term deductible. You put in no affidavits or declarations indicating the 5% of loss is appropriate. We wouldn't need any because our first argument was that the term deductible is unambiguous. You don't get to extrinsic evidence of TIV. The Court decided against you on the issue and decided 5% is ambiguous. Understood. Understood. And they could have decided that as a matter of law. That was not. And the only declarations put in were the ones of the insurance carrier saying it was something other than 5% of loss. Your side put in no affidavits or declarations. And the reason – What's the district court to do with that? It's got evidence from only one side. Well, I don't think it's fair, Your Honor, to say that it only had evidence from one side. What is better – what is the best evidence of what a contract means than the contract language itself? To say that a term is ambiguous and then we're going to open up to extrinsic evidence and say, you know what, we give more weight to the extrinsic evidence than we do to the actual term of the policy itself, the policy itself, the language of the policy itself, is evidence of what the policy means. There was nothing in the policy itself that related TIV to the 5% deductible. That evidence came from pre-binding documentation, schedules of values and so on and so forth. So even – and that's why I'm saying we're not – we're not – for purposes of summary judgment, we're not arguing that we're right. We're not arguing on the merits. I don't understand at all how the district court came out on 5% of what the district court said it was, because it doesn't make any sense to me. And it may be 5% of loss is appropriate, but I don't know how the district court would come to the conclusion of 5% of loss if the – if the district court finds this ambiguous and only one side puts in evidence. I don't know where that leads you in protecting your argument of 5% of loss. You – Well, I think – I think one, again, is the – is the language of the provision itself, but also relying on this Witherspoon case that says you interpret that provision in the context of what an average purchaser of insurance would – would think. And – and Witherspoon even goes further to say that even if that is contradictory of the original intent of the insurer, it doesn't matter. You still interpret it in that light. And so, again, I would just rely on the reasonable insurance. I get your point. You said the TEIV documentation doesn't – didn't relate to the deductible or – Caliber One has made – Caliber One's position, and I'm sure I'm correctly stating this, is that the 5% deductible was based upon the total insured value of all the WCFC properties. That doesn't – that's – that doesn't show up anywhere in the policy, that relationship. It is in documents outside the insurance contract, which is why the court had to find that the deductible was ambiguous, the deductible term was ambiguous, so it could go outside, grab those outside documents, bring them in. That still doesn't mean that extrinsic evidence outweighs the – the expressed terms of the contract itself. I'm – I'm way over my time, Your Honor, so I'll relinquish the podium. May it please the Court, William Pellandini, on behalf of the FLE, Caliber One Insurance Company, let me start by clearing up some confusion. It appears to me some confusion from the record.   Crump was involved from the very beginning. If you look at – in the supplemental excerpts of record at page 81. Which number? 81 in the supplemental excerpts of record, you'll see that in 1998, before the first policy was taken out, Crump issued a proposal to Caliber One. So there's no question that Caliber One was involved as Wade Cook's broker and agent from the very beginning. And, in fact, in that initial proposal, they asked for $5 million in earthquake sublimit. And that's what the insurance company thought it was insuring? In the first policy, that's correct. In fact, it did insure – the limit in the first policy was $5 million sublimit. And is it true that the underwriting on the policy and pricing of the policy assumed $5 million? No. Pricing of the policy had nothing to do with the earthquake sublimit. How do we know that? I'm sorry? How do we know that? I mean, insurance companies don't usually give free $5 million coverage. Well, in fact, they do, Your Honor, depending upon the nature of the policy and the scope of the coverage that's provided. But the particular issue is addressed in Mr. Schlenk's affidavit, which was before the Court, that said not only from Caliber's perspective that the earthquake coverage was not calculated into the premium, therefore, that any change in coverage would not be reflected in the premium, but it so advised Wade Cook. Now, that's an uncontroverted declaration in the record that was before the district court. There's nothing in the evidence to challenge that assertion at all. What was advised to Mr. Cook? I'm sorry? That it wasn't in the premium. That's what – that he knew Cook knew about that. Yes. Mr. Schlenk says not only was that the calculation of the premium, that it did not include the earthquake sum limit for that purpose, but that he had informed Wade Cook and its broker of that fact. Okay. So help me understand, then, why the insurance company, which originates the mistake, and there's no signal in the premium to the insured that there's been a change in level of coverage. Why, in this case, it's appropriate to say, gee, you know, we didn't pick up the $5 million to $500,000 mistake. You didn't pick it up, and it didn't make any difference from our pricing of the policy. But, aha, guess what? When time comes to collect, you're on the hook because you should have picked it up, even though you didn't pick it up either. And you're the one – you, your client, is the one that created the mistake. And that would certainly be an appropriate response if we were dealing with that first renewal. But we're not dealing with the first renewal. Why is there a difference between the first renewal and the second renewal? I mean, it seems to me a mistake was made, and then it was just perpetuated. Well, you have separate contracts here. Prior to the second renewal, which is a very standard operating procedure in this case, the broker submits the renewal and submits it to the underwriter. In submitting the renewal application, if you will, in December of 2000, the broker asked for $500,000 earthquake limits. And the policy was issued in that year. Did they ask for that specifically, or did they ask for a renewal of the premium of the policy?  Now, if you look at the quotation, it's in the record. Let me give you the number. The 2000 quotation is November – let me see if I can find it. It's at excerpt of record, page 114. Excerpt 114. Excerpt 114. That was on November 17th, 2000. The broker submits that to the insurer and asks for $500,000 earthquake limits. The broker then revised that quotation, making other changes. Changes to the premium that it wanted to propose to the insurer. It changed the total value of the properties insured. It did not change the requested sublimit for earthquake coverage of $500,000. Resubmitted that on November 28th, 2000, which can be found at excerpt page 121 to 122. So at the time of excerpt 114, the Scrivener error had already occurred. The Scrivener error occurred in issuance of the 99-2000 policy. Correct. So then Crump looks at that policy and sees $500,000 earthquake, so he asks for $500,000 earthquake. Same as the policy before. Correct. But is there any evidence that Crump knew that was a mistake, that he knew the first policy was $5 million? Well, the policy, the prior policy was issued with $500,000 limits on the face of the policy and all the binding confirmations that went with it. That's the prior, the first renewal. That's the first renewal. That's the first renewal. Which you said we'd be in a different case if that were what we were litigating. That's true. But that's not the policy we're dealing with. But nevertheless, that first policy was issued with $500,000 earthquake limits, not $5 million. It may have been a mistake. But nevertheless, the policy was issued with $500,000 limits. That was a mistake. It was a mistake. But nevertheless, the policy was issued with $500,000 earthquake limits in December of 1999. So your argument is there was negligence on the part of Crump which is attributable to the assured, and therefore, there's no mutual mistake. Well, it's more than mere negligence. And I think that's when we get into the Dinaxis case, Your Honor. The Supreme Court of Washington at Dinaxis looked at very similar facts in a different factual context and commented and stated the rule that if you have an opportunity to examine the document and in exercising reasonable care would have discovered the mistake, you have constructive knowledge of the true fact. Because what you've said is in the first renewal, it would be the company's fault and therefore, that first renewal. So what would they be looking at? The next policy, what they've got in front of them is the erroneous policy which you say Caliber 1 is responsible for. So they put into the chain of documentation a mistake. And that mistake is the mistaken document is what Crump is looking at. Correct. So why would they know it was a mistake? What shifts it all of a sudden? Because they had to have the intent to insure for $5 million or the whole claim fails. Crump was knowledgeable that they wanted the renewal on the same terms and conditions that appeared in the policy. So you say they should have known $5 million and so did the company. So Crump should have picked that up, but so should the company in the first iteration is what I'm understanding. Right. In the first iteration. So neither side picks it up. Correct. All right. So now it's sitting and the next time Crump is going to look at it, it's not going to go back and look at the $5 million. What it's going to go back to is going to go back and see we're supposed to get the same policy. It could have been a whole different person. Who knows? But looks at it and says, well, same terms. Now we look at the coverage and we're told to get the same level of coverage, and what Caliber 1 did was create an error in our point of reference, which is we're looking at it and so they are intending to get the same level of coverage. I don't understand how somehow the Caliber 1 is off the hook for creating a mistake, which it itself. Well, you have to go back. Why isn't that as mutual as anything? Well, I'll get to that in a minute. You have to go back to the first iteration, back in 1998. The broker, Crump, asks for $5 million. Yeah. When that policy is renewed, by mistake it shows $500. But the intent, in order for this claim to even be before the panel, Wade Cook had to have the continuing intent to have $5 million. Didn't he? Okay. Well, yes. Yes. Okay. But under the Dinaxis case, with that intent, by Crump as the agent, knowing that my client wants $5 million and looks at a piece of paper that says $500,000, what Dinaxis says is you had the opportunity and the exercise of reasonable care to recognize the mistake. To now recognize the mistake. Yes. Even though presumably they had the same intent and knowledge on the first renewal. Correct. So why were you assuming liability on that one, then? I'm sorry? You said on the first renewal it would have been a different case. It would have. They had the same intent. Well, it would have been a different case because clearly the evidence there is there was mutual intent to issue the policy at $5 million. Now, let me talk about intent. Okay.  I'm going to go back to the Dinaxis case, because the project manager in Dinaxis had the knowledge of the true square footage that was submitted. And so that's he had the knowledge of the truth, whereas in this case, Crump didn't know that the $500,000 was a mistake. In Dinaxis, the court said it's not the knowledge of the mistake that is attributed and imputed up to the principal. It is the knowledge of the true fact. Now, here, in order to sustain the – How did he have the knowledge of the true fact? Ah, but in order to sustain their claim for mutual mistake, they have to start with the premise that they wanted $5 million. But they didn't. Crump must have known they wanted $5 million. So it was in possession of the true fact. In possession of, but negligently did not follow. And you indicated earlier there's a Washington Supreme Court case that indicates that negligence is not sufficient. That's not what was told, is it? No, I said in the Dinaxis case, the court reiterates the statement that negligence is not necessarily a bar, need not be a bar to mutual mistake. But then it goes on to remind us – You're familiar with Washington Mutual v. Hendry? Yes. And the language there seems to me, and you tell me why I'm wrong, seems to fit this case. In discussing the ability of reformation as a remedy when there was unilateral mistake, Gamble Court stated that the fact that the first party was negligent in failing to observe that the writing does not express what he is assented to does not deprive him of this remedy. Then goes on to say it is not determinative that the mistaken party could have noticed the discrepancy between in his understanding and the written agreement by reading the documents. It clearly shows, it seems to me, that Washington court, along with other jurisdictions, they say, are in agreement that negligence is not a bar to reformation. Right. Now, so if he was negligent, the Washington Supreme Court says that that doesn't bar reformation. Why doesn't that fit here? For two reasons. If he was negligent in failing to pick up the 5 million, maybe when the assured not checking every part of it. Right. For two reasons. One, Hadrian was a unilateral mistake case. In order to obtain reformation in unilateral mistake, the other party must have engaged in fraudulent or inequitable conduct. That's not the case here, and the Court was looking at the sole act of the person making the unilateral mistake. The burden here is to demonstrate mutual mistake, and that, again, takes us back to Thaddakis. After fighting a mutual mistake. I'm sorry. There was a mistake. Initially. Well, it's carried through. No, no. Mr. Schlenk says in his declaration that on the second renewal, they asked for $500,000 in earthquake limits, and he gave them what they wanted. It was his intent to issue the policy for 500,000. The continuing mistake issue would be relevant or persuasive, even, if we didn't have these breaks and actions undertaken by the principal's own agent. Issuing certificates to third party, representing that the earthquake limits are $500,000. Two of them. That's in the record. Issuing quotations seeking coverage for $500,000. Asking that coverage be bound on the 2000-2001 policy for $500,000. Receiving Caliber's confirmation of Binder at $500,000. That's what the district court had in front of it. It is. But if, as you say, the insurance company said, oh, look, it's going from 5 million down to 500,000, that's a big difference in premium. Not so, Your Honor. I respectfully disagree. You mean, okay, that's a big difference in coverage for which the insurance company is required to have reserves. Yes. Yes. And a half, a $4.5 million change would make a substantial difference to the insurance carrier on this particular policy. But there was no indication of any change of practice on the insurance carriers in spite of this very substantial change in coverage. We have to remember this is a commercial property policy that offers many, many kinds of coverage. Earthquake coverage is one part. General property loss is the vast majority of claims that hit an insurance company. Earthquakes are relatively rare occurrences. They do not factor. But very high premium. They are, indeed. But, Your Honor, I must go back. You're in Seattle, where you're right on the lip of the Pacific and the American Sea. Don't bring down any map. I got this. But we have to go back to the record. There's nothing in the record to dispute Mr. Schlenk's testimony that in a commercial package property policy, a sublimit on earthquake does not drive the premium. There's nothing in the record. There's no declaration from Crump. There's no declaration from an insurance expert or an executive from another company. There's nothing. Okay. So could we, because of the time, could we address the deductible? Yes. I'm sorry. Why, in the ordinary language, percentage on an occurrence doesn't mean pluses. But if you look at the same proposal that I mentioned. Wait a minute. Let's start. Don't you agree that the starting place for interpreting what an insurance policy means is the four corners of the insurance policy? Correct. All right. So let's look at, I guess it's, I don't know, CIS 130, where the insurance company describes how it calculates, what a deductible is, and how it's calculated. It describes the deductible in relation to the amount of loss. We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the deductible, which seems pretty unambiguously to me to say that it's calculated in relation to the loss, because the loss must exceed the deductible before you are entitled to any coverage under this policy. Right? The provision you're reading deals with the insurance company, the limits of the insurance company's exposure on a loss. That's correct. All right. And then in the next page, your insurance policy gives us an example, several examples. Example number one, deductible is $250. You know, limit of insurance building one, limit of insurance building two. So then it says the deductible will be subtracted from the amount of loss in calculating the loss. And for building one, it's 60,100 is your limit of insurance. You subtract the 250 deductible, and the loss payable is 59,850. Now, why doesn't that unambiguously tell the insurer how to calculate the deductible? It doesn't tell the insurer how to calculate the deductible at all. That deals with the payment by the insurer once the deductible is met. If you look at the declaration page to the policy, it states the deductible in terms of a percentage. A percentage, by definition, must have a reference point. The problem is with this deck page is it doesn't have a reference point. On that basis, 5 percent of what? That's why you argued below that there had to be the reference point, the total insured value. No, that didn't. Let me correct that as well. Our position is it's the total insured value at the affected location. Okay. Well, okay. That's total insured value of the building at the affected location. The building that fell down in the earthquake, right? Well, in this case, the earthquake didn't damage all the buildings? No. Well, it damaged more than one. Right. But the claim has to do with their corporate headquarters building. Well, if what would be the total insured value of the buildings that were damaged in the earthquake? Well, the total insured value of all the properties was some $19 million. The value stated on the property schedule for the headquarters, the corporate headquarters building, was $13 million and change. Okay. Well, suppose that the earthquake had damaged all of the insured property. 5 percent of the value of that would be $695,100 if you do the calculation of the total, all the buildings. All the buildings would be 5 percent of $19 million, so whatever that is for what's $19 million, half of $19 million. The total insured value. Well, my point is, if you do the calculations, there was no earthquake insurance under your theory of what the deductible means because your deductible, your percentage of the total insured value, if the earthquake damaged all the buildings, would be well over the $500,000 amount erroneously put into the contract. So how is that a reasonable interpretation? Well, you do have insurance. You have insurance for whatever you insured for. If you insured for $500,000, you have $500,000. If I insure my house for $100,000 and it's worth $600,000. So once the deductible is met. Right. So are you saying? It's $500,000 in addition to the deductible. To the deductible. So you have the insurance. You have $500,000 once the deductible is met. The question is, what's the insured's responsibility under the loss? But starting with the declaration page, it just says 5%. The Court on that basis said, well, 5% of what? We have to go beyond. It's ambiguous. No, you don't. Don't you have to read the entire policy? You read the entire policy and interpret the meaning of its terms. You don't leap from the declarations page of a policy to exquisite evidence. But there's nothing in the policy that tells you 5% of what? Well, it says per occurrence. Oh, per occurrence. 5% deductible per occurrence, and the deductible is based on loss or damage. Okay, so the loss or damage to the building is, you know, if I have a, let's say I have a 1% deductible on my car, okay, and it suffers $5,000 in damage or whatever, that's what I come and make the, that's the occurrence, that's the claim, $5,000, subtract 1% of that. Right, but occurrence is not a valuative term. It doesn't tell you what the value of anything. The property schedule tells you what the value is. It says we will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the deductible, okay? 5% deductible earthquake per occurrence, okay? So an occurrence to, you know, the occurrence is damage, loss. Okay, that's what I've suffered. Loss or damage, that's what it's, you know. So I come to you and I say my building collapsed and I suffered $7 million in damages. 5% times $7 million is $350,000 deductible, okay? It exceeds the $50,000 minimum. You owe me the balance over $350,000. Well, I can't, I can't accept your premise because that's not what the occurrence definition does. Occurrence definition. What is the definition of occurrence? Is it? I was having trouble finding the definition of occurrence in your policy. There's a definitional section that appears at the end of the property form. Do you have it? What does the occurrence definition say? I don't have it. Do you know what it is? Is it the general occurrence definition that's standard in the industry? Well, it's not the same occurrence definition you'd see in a CGL policy. It's a property policy. Right. I know this is a property policy. Right. But I don't know. I'm sorry, Your Honor. Okay. It's in the record. Yeah. Does anyone have anything else? No, I think we've exhausted it. Thank you very much. The case of Calabert Wine and Doughney Company v. Cary will be submitted. Do we still have the bill? Pardon me? Okay. Thank you. And this Court will be in recess for about 10 minutes. All right. This Court stands in recess.
judges: Wallace, Wardlaw, Fisher